## Lanferman, et al. v. Vanzile.

(Decided November 26, 1912.)

Appeal from Kenton Circuit Court
(Common Law and Equity Division).

Adopted Child—Inheritance from Foster Parents—Descent.—When an adopted child dies in infancy and without issue, the estate which he inherits from his foster parent descends to the kindred of that parent, and not to the natural kindred of the adopted child.

EDWARD J. TRACY for appellants.

R. G. WILLIAMS and O'REAR & WILLIAMS for appellee.

OPINION OF THE COURT BY CHIEF JUSTICE HOBSON—
Reversing.

Henry Lanferman and his first wife, Anna Lanferman, by a proceeding duly had, adopted, on June 12, 1891, Albert Urlage, who was then seventeen months old. His foster parents took him to their house and reared and educated him as if he was their natural child, he being known as Albert Lanferman. They afterwards had three children of their own. The wife died intestate and Henry Lanferman married a second time. He then died intestate, leaving property in the city of Covington. After the death of Henry Lanferman the adopted child, Albert Lanferman, died unmarried and without issue, in infancy. A partition suit was instituted to divide the estate of Henry Lanferman among his three children. In this proceeding Clara Vanzile, the natural mother of the adopted child, Albert Lanferman, filed her petition claiming that he took, at the death of his foster father, an undivided one-fourth of the estate and that this one-fourth descended, at his death, to her. The three children of Henry Lanferman demurred to this pleading. The court overruled their demurrer and they failing to plead further judgment was entered in favor of Mary Vanzile for one-fourth of the property. They appeal.

The case turns on the rights of adopted children, under our statutes. Section 2071, Ky. Statutes, provides that an adopted child shall be, "as such, capable of inheriting as though such person were the child of such petitioner." In Power v. Hafley, 85 Ky., 671, the adopted daughter died, leaving two children before the death

of her foster father, and it was insisted that as she died before her foster father neither she nor her children took any interest in his estate. Rejecting this contention the court summed up its conclusions from the authorities, as follows:

"That it is the event of adoption that fixes, under the law authorizing the adoption, the legal status of the adopted child; and the child, by the event of adoption, becomes the legal child of the adopting parent, and stands, as to the property of the adopting parent, in the same light as a child born in lawful wedlock, save in so far as the exceptions in the statute authorizing the adoption declare otherwise. And when the statute authorizes a full and complete adoption, the child adopted thereunder acquires all of the legal rights and capacities, including that of inheritance, of a natural child, and is under the same duties. * * * So, taking the logical sequence of the language of the act, supra, aided as it is by the principles of the civil law, the conclusion is inevitable that the appellants are the legal grandchildren of Frederick Hafley, and as such are entitled to share in the distribution of his estate under our laws of descent."

In Atchison v. Atchison, 89 Ky., 488, the foster father died, leaving no children except the adopted child, and the widow insisted that he had died "without issue," and that she was entitled to one-half of the surplus personal property, under the statute. Rejecting the contention of the widow, and citing, with approval, Humphries v. Davis, 100 Ind., 369, which will hereafter be referred to, the court said:

"The mode of descent and distribution is regulated by the statute, under which all of these parties would have taken if there had been no will and when the adoptive father dies intestate the child, inheriting as if, in fact the child of the decedent can take in no other mode than that pointed out in the statute. What interest, then, has the widow of the adoptive father in her husband's estate? If he left a child to inherit his estate, then the widow, in distributing the personalty, would be entitled to one-third of the surplus, and, if no children, to one-half. In determining the extent of the widow's interest in the personalty, regardless of the statute, the word issue has always been construed to mean a child or children, or their descendants, born of the marriage and capable of taking at the death of the

intestate; but the statute in question has intervened and on the application of both husband and wife the adopted child is made to inherit in the same manner as if a child in fact."

The statute regulating the descent of real estate is section 1393, Ky. Statutes, which provides that when a person shall die intestate his real estate shall descend "first, to his children and their descendants;" but section 1401, which is a part of the same chapter, and is one of the limitations upon section 1393, is as follows:

"If an infant dies without issue, having title to real estate derived by gift, devise or descent from one of his parents, the whole shall descend to that 'parent and his or her kindred as hereinbefore directed, if there is any; and if none, then in like manner to the other parent and his or her kindred; but the kindred of one shall not be so excluded by the kindred of the other parent if the latter is more remote than the grandfather, grandmother, uncles and aunts of the intestate and their descendants."

The purpose of section 1401 is to prevent the estate of a parent from being distributed to strangers to his blood when any of his children die in infancy without issue. The natural child who inherits under section 1393 property from his father, takes it subject to this limitation, that is, subject to the limitation that if he dies in infancy and without issue it goes exclusively to his father's kindred as provided in section 1401, but the adopted child is by his adoption placed on the footing of a natural child. He takes under the statute "as though he were the child." It was not the purpose of the statute to give him greater rights than a natural child or to release him from the limitations imposed upon the inheritance in the hands of a natural child. When it provided that the adopted child should take "as though he were the child," can it be believed that the Legislature intended that the property inherited by a natural child should not go to a stranger to the father's blood when the child dies without issue and under twenty-one years old, but that if the adopted child should so die this property should go to strangers of the father's blood? Section 460, Kentucky Statutes, provides:

"The rule of the common law, that statutes in derogation thereof are to be strictly construed, is not to apply to this revision; on the contrary its provisions are

to be liberally construed with a view to promote its objects.''

The statute must be liberally construed with a view to promote its purposes and when so construed no reason can be assigned for exempting the adopted child from the rule governing a natural child when he dies in infancy and without issue.. In Merritt v. Morton, 143 Ky., 133, we held that an adopted child did not inherit from the mother of his foster mother, the ruling being based upon the ground that the statute makes the person adopted capable of inheriting from the person adopting him as if he were his natural child, but does not make him capable of inheriting from other persons. This ruling seems to be in accord with authorities everywhere. It is also universally held, under similar statutes, that the person adopting a child does not thereby become capable of inheriting property from the child unless it is so provided in the statute, but neither of these principles have any application here. The question here is simply, what is the proper construction of the statute? Was it intended to put the adopted child on the same footing as the natural child and does he take his inheritance subject to the same limitations, if he dies in infancy and without issue? In Humphries v. Davis, 100 Ind., 369, which was, as we have said, cited with approval by this court; in Atchison v. Atchison, supra, a child was adopted by a husband and wife. The wife died and the child inherited the property from her. The child then died, without issue. It was held that this property went to the surviving husband and not to the mother of the child. In this case the court overruled an earlier decision holding otherwise, basing its conclusions on the fact that adoption has been borrowed from the Roman law, and that under the Roman law when an adopted child died in infancy, without issue, the property went back to that parent's heirs from whom it came. We have examined, with great care, the decisions in other States, but they usually turn on the phraseology of the statute there in force and so, in the end, this case must depend upon the construction of our statute.

In Bailey v. Commonwealth, 11 Bush, 691, the court said:

''Words in a statute were always to be understood according to the approved use of language. But there are other rules of construction of equal dignity and im-

portance which must not be overlooked, and which, although not incorporated in our statute, are as binding upon the courts as if embodied in it. One of these rules is that 'every statute ought to be expounded, not according to the letter, but according to the meaning;' and another that 'every interpretation that leads to an absurdity ought to be rejected;' and still another that a law 'ought to be interpreted in such manner as that it may have effect and not be found vain and illusive.' "

In Sams v. Sams, etc., 85 Ky., 400, it again said:

"It is a well-settled rule of construction, that the letter of a statute will not be followed when it leads to an absurd conclusion; but, on the contrary, the reason for the enactment must enter into its interpretation, so as to determine what was intended to be accomplished by it."

To the same effect see Brown v. Thompson, 14 Bush, 538; Commonwealth v. Reynolds, 89 Ky., 147; Commonwealth v. Trent, 25 R., 1180; Irwin v. Smith, 150 Ky., 147. The construction we have adopted is within the letter of the statute, and is certainly required by its spirit and the reason for its enactment. No confusion will result from this construction. Where the adopted child who dies in infancy without issue receives property from one of his natural parents it will go back to the kindred of that parent, and where he receives property from one of his adopting parents it will go back to the kindred of that parent.

In Hale v. Robbins, 53 Wis., 514, the adopted child inherited property from its natural mother, and died intestate. The adopted father set up claim to it, and his claim was rejected. The language used by the court must be read in the light of the case before it. In Reinders v. Koppelman, 68 Mo., 482, the adopted child died without issue after becoming of age. In neither of these cases was there any question as to the rights of the father's kin under a statute like ours where the adopted child dies in infancy without issue.

In 1860, when the Legislature enacted the adoption statute, the law of descent and distribution was as it is now, and when the Legislature provided that the adopted child should inherit as a natural child, it must be presumed it was aware of the limitation placed on the inheritance of a natural child, section 1401 being then in force; and certainly there is nothing in the language it used giving the adopted child greater rights

than a natural child. Both these statutes were afterwards brought over into the revision of 1873 with some changes of phraseology, and from that revision into the Kentucky Statutes in 1893, and upon well settled principles must now, as parts of the same revision, be read together. (Commonwealth v. International Harvester Co., 131 Ky., 551.) The argument that the words "parent and child" are used in the statute of descent and distribution to denote only a natural parent overlooks the fact that the two statutes are to be read together.

The position that the word "kindred" is used in chapter 39, Kentucky Statutes, to denote kindred by blood is not new to this court. This contention was made in Power v. Hafley, 85 Ky., 675, and in answer to it the court said:

"The word 'kindred,' in section 1, chapter 31, General Statutes (now chapter 39, Kentucky Statutes), is not necessarily confined to blood relations, nor is the word 'children,' in subsection 1, necessarily confined to children born in lawful wedlock. For those sections must be understood as merely laying down the general rules of inheritance, and not as completely defining how the status is to be created which gives the capacity to inherit. Section 1 does not undertake to define the word 'kindred;' the word may include in its meaning a relation by blood and a relation in law. The word 'children' may include in its meaning children born in lawful wedlock and children made legitimate by the marriage of their parents, and children of adoption, for the latter are the legal children of their adoptive parents. So, whenever the kindred by blood or in law have the right to inherit, either by general or special law, section 1, *supra,* includes them."

What was said in this case was approved in Atchison v. Atchison, 89 Ky., 488. If the adopted child is included within the term kindred under section 1393, Kentucky Statutes, we see no reason why the foster parent is not a parent within the meaning of section 1401, Kentucky Statutes, which is a part of the same chapter, and was intended to lay down a limitation upon the rights of those who take the estate under section 1393. The statute does not make the foster father the heir of the adopted child. The case does not turn on the question, who is capable of inheriting from the adopted child? It turns on the question, what estate does the

adopted child who dies in infancy and without issue take in the estate of his foster parent? The adopted child under the statute is "capable of inheriting as though such person were the child of the petitioner." He, therefore, takes under the statute the same estate as the natural child. The estate of the natural child which he inherits from his parent is defeated by his death in infancy without issue, and the property then goes back to the kindred of that parent. The adopted child inheriting as though he were the child of his foster parent, takes subject to the same limitation, and when he dies in infancy and without issue, the property under the statute descends to the kindred of that parent from whom he received it.

Judgment reversed and cause remanded, with directions to the circuit court to sustain the demurrer to the petition of Clara Vanzile, and for further proceedings consistent herewith.

Judges Winn, Settle and Lassing dissent.

DISSENTING OPINION BY JUDGE WINN.

This case involves the descent of real property which an adopted child had inherited from his adopted father, the adopted child dying before becoming of lawful age. Albert Lanferman was born Albert Urlage. In his infancy he was adopted by Henry Lanferman, by whom he was reared. The adopted child lived with him until the death of the adopted father. The adopting father left three children of his own blood and this one adopted child. His small real estate was inherited by the four. The adopted child shortly afterward, then twenty years of age, died unmarried and without issue. He left surviving him his mother. The contest here is over this one-fourth interest of Henry Lanferman's real estate, between the adopted son's natural mother upon the one hand and the natural children of Henry Lanferman upon the other. From a judgment in favor of the natural mother, the Lanfermans appeal.

Under section 2071 of the Kentucky Statutes it is declared that an adopted child shall be "as such, capable of inheriting as though such person were the child" of the adopting parent, a descending right of inheritance, a right coming down to the adopted child, and not ascending from him.

In Power v. Hafley, 85 Ky., 671, the adopted daughter died before the death of her adopting father, leaving two children. It was insisted that as the adopted daughter died before the adopting father, neither she nor her children took any interest in his estate. The court rejected this contention, saying that "the child, by the event of adoption, because the legal child of the adopting parent and stands as to the property of the adopting parent in the same light as a child born in lawful wedlock." It held that the children, therefore, of the adopted daughter had the rights of legal grandchildren in the property of the adopting father—a determination of the rights gained under the statute by the one adopted as a descending right, the only nature of right awarded by the statute on adoption.

In Atchison v. Atchison, 89 Ky., 488, the adopted father died leaving no natural children. As the law then stood, the widow's portion of her husband's estate was determinable in part by whether or not the deceased left issue. It was held that "the result of the adoption was such a to make the child capable of inheriting as thought she were their natural child." Here, again, the rights adjudicated were descending rights, the rights of the child to take the property of the adopting parent, not the right of any adopting parent to take from his adopted child.

In the case of Merritt v. Morton, Admr., et al., 143 Ky., 133, this court had under consideration the right of an adopted child to inherit from the mother of his adopting mother. The court denied the right. It discussed the Power and Atchison cases, supra. It said that those cases held that the adopted child was capable of inheriting from his adopting parents. It refused to allow the adopted child to inherit through the route of the adopting mother, from the mother of the adopting mother. Said the court: "The act of the foster parents in adopting the child is a contract into which they entered with those having the lawful custody of the child, an agreement personal to themselves, and while they have the perfect right to bind or obligate themselves to make the child their heir, they are powerless to extend this right on his part to inherit from others." The court refused in the Merritt case, therefore, to recognize any ascending scale of rights derived from the adopting statute. It held in effect that the right afforded by the statute to the adopted child and those under him to take from

the parent adopting him, was the only right resulting from the act of the adoption.

It is not argued in the case at bar anywhere or by anybody that an adopting father has, by virtue of the statute, or by virtue of the relationship assumed through the statute any right of inheritance from the adopted son such as a natural father would have. It is nowhere claimed that the adopting parent has any such right of inheritance as would a natural parent. It is not claimed anywhere that he is a parent in the sense in which we commonly know that word. So far, therefore, it must be admitted by any reasoning mind that the one adopting is not the "parent" of the adopted child in the sense that he takes under any statute or any law the right to inherit from the one whom he has adopted.

But, says the majority opinion, section 1401 of the statutes intervenes in their favor. So much of the statute as is necessary to note, says: "If an infant die without issue, having the title to real estate derived by gift, devise or descent from one's parents, the whole shall descend to that parent or his or her kindred," as under the general laws of inheritance. The majority opinion holds that though the adopting parent is not a parent in that he has no right to inherit generally from the adopted child, or to transmit inheritances from his parents through himself to the adopted child, yet he is a "parent," within the meaning of section 1401 of the statutes. It takes no theorizing or straining of constructions to say who is a parent. It seems singular indeed that the question could ever have been raised; yet we find that it did come up in the case of Hale and wife v. Robbins, et al., 53 Wis., 514. In that case the statute went to the extent of declaring that the child was adopted "to all intents and purposes as if such child had been born in lawful wedlock of such parent or parents by adoption." The adopting father claimed as result of the relationship created by the statute, the right of inheritance from the adopted child. Said the court:

"The statute having expressly declared that the adopted child shall inherit from the adopted parent, and having omitted to declare that the adopted parent shall inherit from the child, we think it must be held, according to the rules of construction, that the general law of inheritance was not intended to be changed in favor of the adopted parent, and that the estate of the adopted child, upon his death wthout a

will, must descend to his kindred of blood as prescribed by section 1, chapter 92, R. S., 1858, as amended. That the word 'parent,' in subdivision 2 of section 1, chapter 920, means natural parents, and not parents by adoption, cannot be doubted. All the other provisions of the section refer to kindred of blood of the deceased; and the word 'parents,' both by derivation and common understanding, means the natural parents.''

A parent is a natural parent, as much so in Kentucky as in Wisconsin. Section 1401 of the statutes, upon which the majority opinion rests, is a part of chapter 39 of the Kentucky Statutes, treating of descent and distribution to the kindred of the blood of the deceased. The chapter nowhere makes in it any mention of the descent of property from a child by adoption. The statute does not say that the property of an adopted child shall go back to the one who adopted him, the one from whom the property was derived. It says that the property of a natural child shall go back to his parent—a child of the blood, a parent of the blood; and it says no more. In order to have the statute read more, we must give the adoption statute an ascending intent, and say that under it the one adopting becomes ipso facto a ''parent'' of the child adopted. If that be true, this boy, had his natural mother and father and his adopting mother and father all survived him, would have had four parents of the first degree, a conclusion which manifests its utter untenability.

But it is argued that the Legislature must have meant, in enacting section 1401 of the statutes, to say that the word ''parent'' meant an adopting parent. Section 1401 of the Kentucky Statutes is section 11 of chapter 31 of the General Statutes, which was section 9 of chapter 30 of the Revised Statutes, edition of 1852. It has come down in amended form from the earliest history of the Commonwealth. Section 2071 of the Kentucky Statutes, creating the statutory right of inheritance by an adopted child, became a law by an act of the General Assembly of date February 28, 1860, long after the enactment of the statute under which it is claimed his adopting father inherits from him. If the Legislature meant to take away from the natural parents of the child adopted the right to inherit from their natural child, just as all other parents inherit from their natural children, the General Assembly doubtless would have said so.

Practically this same question came before the Supreme Court of Missouri in the case of Reinders v. Kopplemann, 68 Mo., 482. The Missouri Statute on adoption was, in substance, the same as our Kentucky Statute. The Missouri court interpreted the adopted child's rights as did this court in the Power and Atchison cases, supra. The court held that no matter the source of derivation of the property owned by the adopted child, it could never go back, under the Missouri Statute, to the adopting parent. The Indiana case of Humphries v. Davis, 100 Ind., 274, which is relied on in the majority opinion as sustaining its conclusion, remarks that the rights of an adopted child came down from the Roman law and not from the common law, and, in substance, that the Roman law must measure or decide the relative rights of all the parties. The Missouri court, in Reinders v. Koppelmann, points out the error into which the Indiana justice fell, some six years later. The Missouri judge said that a very cursory examination of the civil or Roman law would show that the statute was not derived from any such source; that the Roman law contained nice distinctions and many other regulations affecting the adoptor, the adopted, and the natural parents; that it originated under a form of government and state of society totally different from ours, and had undergone various mutations, not only in the country of its origin, but in the modern governments which succeeded the Roman Empire. He pointed out that prior to the time of Justinian, the effect of adoption under the Roman law was to place the person adopted precisely in the position he would have held had he been born a son of the person adopting him, for ascending and descending purposes of inheritance; that the ceremony was a very formal one, in which the natural parents were required to participate. The Corpus Juris of Justinian changed the more ancient rule. We quote as follows from Mr. Sanders' translation of the Institutes of Justinian (p. 22):

"But now by our Constitution when a *filius familias* is given in adoption by his natural father to a stranger, the power of a natural father is not dissolved; no right passes to the adoptive father, nor is the adopted son in his power, although we allow such son the right of succession to his adoptive father dying intestate."

The law of Justinian completely altered the old law and set out expressly that no right passed to the adop-

tive father. The Kentucky Statute law, the only law
we have upon the subject, is ·distinguishable from the
Roman law, either before or after the time of Justinian,
in many important particulars. Under the Kentucky
Statute the natural parents of the adopted child do not
have to participate in the ceremony of adoption, nor do
they lose any of ther natural rights of inheritance from
him. Our statute makes no distinction between the per-
son who is adopted and any other natural person inso-
far as regards inheritable capacity from him. It leaves
the natural parents to inherit from him his property,
however received, just as the blood kin of another per-
son take from such other person. The Roman or civil
law, unlike parts of the common law of England, was
never brought by our Constitution or by any legislative
action into our system of jurisprudence. Edward
Jenks, in his Short History of English Law, relates his-
torically the influence of the Roman law in English jur-
isprudence. He observes that the great Corpus Juris of
Justinian, published on the shores of the Bosphorus just
before the final severance of the Eastern and Western
Empires, superseded the barbaric versions of the Code
of Theodosius. He adds that it had no regal force west
of the Ardiatic; but that as a revelation of the wisdom
of the ancient world it came to be studied feverishly and
its teachings applied to make good the yawning gaps in
the laws of Western Europe. After a time there came a
jealousy and in a sense of condemnation of it; and while
it is idle to suppose that its knowledge was not made use
of, especially in the solution of those problems for
which the ancient customs made no provision, its influ-
ence in English law became secret and, as it were, illicit.
Insofar as it is based upon sound principles of natural
justice it may be in force here, not because it is the civil
or Roman law, but because, being based on sound reason
and affording sound principles of interpretation, it is
the law everywhere. It cannot be said to be the law of
Kentucky to the exclusion or sharp alteration of the
law as our General Assembly has seen fit to declare it.
When the Legislature undertakes to legislate upon any
given subject it is presumed to exercise the legislative
will upon that subject in entirety. It has defined the
rights between the child adopted and the adopting
parent; and it has seen fit to make those rights descend-
ing only. We cannot superimpose upon that legislation

the tenets of the ancient Roman law on the subject, themselves superseded by the Institutes of Justinian.

Reverting again to the word parent. Webster defines it as "One who begets, or brings forth offspring; a father or a mother." It is of kin to the Latin *parere,* to bring forth, and to the Greek *porein,* to give or to beget. In other words, a parent is one who begets an offspring, and not one who, under the statute, adopts another person as his heir. The first section of chapter 39 of the Kentucky Statutes, that of which section 1401 relied upon by the appellants is a part, opens with a declaration that when a person dies having right or title to property, it shall descend in parcenary *to his kindred.* The word "kindred" in its primary legal acceptance means "relatives by blood." The dominant idea of blood relation as the lodestone of inheritable capacity and right is sharply accentuated by section 1395, Kentucky Statutes, found in the same chapter, which casts upon collaterals of the half-blood only one-half as much in distribution as upon those of the whole blood. Throughout the statutes of the several states, consanguinity is fundamental in legislation fixing the descent and distribution of property. True, the subject is one of the legislative will; but legislation repudiating or eliminating blood-kinship from the descent of property would be so abhorrent to every spontaneous instinct of our home and family centered race as to meet with universal disapproval. The courts should depart from this elemental blood-guideship only when enforced to do so by an inexorable statutory demand. Our Kentucky Statute is inexorable in its demand that the estate of one dying shall go to his kindred, those of his blood, flesh of the flesh, bone of the bone. To such kindred, the father, the mother, the grandfather, the grandmother, the children, the grandchildren, the collaterals of blood relation, and only to those who are kin, those who are of the same blood, does the chapter anywhere extend; saving and excepting where it has been directly modified by statute, as in the descending right of adopted children to take as children of the blood. Power v. Hafley, 85 Ky., 675, cited in the majority opinion, so holds, and no more. The statute on adoption must be read into the statute of distribution and descent, for otherwise it would be meaningless; but it is to be read in only to effectuate the precise terms of the statute on adoption, that is, to preserve the right of inheritance

in the adopted child afforded him by the statute. The act of adoption gives to and does not take away from the child. It makes him the heir of another, but it does not make that other his heir. It makes him a child to inherit, but it does not make the one adopting him a parent to inherit from him. As was well-expressed in Shafer v. Eneu, 54 Pa., 304, "the right to inherit from the adopting parent is made complete, but the identity of the child is not changed; one adopted has the rights of a child without being a child." If, under section 1401, a part of the chapter on descent and distribution, we are by judicial declaration to enact that the word parent, in an inheritable sense, means one who adopts another, we will need also to place the same interpretation upon the same word where it is found in subsection 9 to section 1393 of the statutes, a portion of the same chapter. If the adopting father is a parent within the intent of section 1401, he must as well be an adoptive parent within the intent of subsection 9 of section 1393. Again, if the word parent must be read as an adopting father within the intent of section 1401, the word parent in section 1400 in the same chapter must be held to have the same meaning. I do not see how the word can be given one meaning in one section of the chapter and a restricted or distinct meaning in another. If it is to be read anywhere as meaning an adoptive parent, it must so be read everywhere within the chapter. This construction of its intent need only be pursued into subsection 9 of section 1393 to see into what a pit of misconstruction and impossibilities we would fall.

I come now to discuss the interpretation put by this court upon section 1401 of the statutes. The first and most important case in its bearing upon the question here is that of Smith's Exor. v. Smith, &c., 2 Bush, 520. In that case an infant had derived title to real estate by devise from her maternal grandfather. She died owning it, before attaining her majority. The litigation came on between her father, who survived her, upon the one hand, and the descendants of the maternal grandfather upon the other. The latter argued that since the spirit of the statute was to keep the property derived by an infant from one side of the parental house, on the side of its derivation, the word parent in the statute, and indeed in common acceptance, was meant to, and was broad enough to, include a grandparent. This court denied that contention and gave instead the property to

the infant's father, as against the heirs of the maternal grandfather, from whom the child had inherited the property. Said the court:

"But will the language of section 9, *supra* (now section 1401, Kentucky Statutes), admit of, or allow, its interpretation contended for? The definition of the word *parent,* according to every lexicographer that we have had the opportunity to consult, is derived from *pario,* to produce or bring forth, the regular participle of which would be *pariens;* but, by some corruption, it is usually written *parens,* and from which we have the word parent anglicized, which is defined *'father or mother,' he or she that produces young.* This is the common understanding of the meaning of the term; and if it has ever been defined to embrace grandfather or grandmother, we have not been able to meet with it; and to so construe it, would be doing violence not only to the definition given by standard authors, but to the common usage and understanding of the country."

Nothing could be more explicit than what was meant by the word parent in section 1401; i. e., *"he or she that produces young."* In that case the production of the young was not permitted to go back one generation further, and the statute was held not to embrace other than the direct reproduction of the species by the one begetting or bringing forth. The question was directly presented and as directly decided. If "parent," within the intent of section 1401, cannot embrace a grandfather because the grandfather is not the immediate begetter of the child, it cannot embrace an adoptive father, no drop of whose blood runs in the veins of the adopted child. I do not see how the case of Smith's Exors. v. Smith, and the majority opinion here, can both stand as law.

In Walden, &c. v. Phillips, 86 Ky., 302, the statute was again up for construction. The doctrine of Smith's Exor. v. Smith, &c., was reaffirmed. The court said that the statute in question "relates to such real estate as the infant derives title to by gift, devise or descent from one of his parents, but not to such real estate as the infant derives title to by gift, devise or descent from other persons." It cited the Smith case and had before it *ex necessitu* the definition given in the Smith case of a parent within the intent of section 1401 of the statutes, as the one who begot the infant.

The statute was again under consideration in Guier, &c. v. Bridges, 114 Ky., 184. Here the Kentucky justice writing spoke of Professor Minor's comment that the provision mars the symmetry of the original law of descent. The writer added, "But it has always been most strictly construed, and the statute has been held to apply only to those cases where the title to the real estate owned by the infant came to him by gift, devise or descent from one of his parents." It then cites Smith's Exor. v. Smith, supra, thus approving again that court's definition of a parent within the intent of the statute. The statement in the majority opinion that the statute must be liberally construed is met directly with our statement in the Guier case that it must be strictly construed.

But it is said in the majority opinion that statutes in derogation of the common law under section 460 of the statutes are to be liberally construed. The adopting of children was absolutely unknown to the common law. It would, therefore, seem that section 460 of the Kentucky Statutes and the cases thereunder cited in the majortiy opinion, cannot have much of application in this case.

I find another entirely distinct but equally conclusive consideration. Section 1401 provides that the real estate of an infant dying without issue shall go to the parent from whom it was derived; but that if there be no parent, it shall go to "his or her kindred" as directed by section 1393. Here the adopting father from whom the child took by descent was dead; and if the statute be sufficient to control the devolution of the title of this infant's land, it must control through the his or her kindred class. Now how do these natural children of the adopting father take, if they do take, within this class, succession to such property? The precise question was up in Talbott's Heirs v. Talbott's Heirs, 17 B. Mon., 1, where the court said: "In the absence of the father, who first takes, his children take, not from the father, but *directly from the infant.* They do not take as lineals, but through a common ancestor, *as collaterals* on the father's side." It is essential to constitute a right of collateral inheritance that the one taking as heir and the one whose property is taken spring from the same common progenitor, root or stock. Collateral necessarily involves the existence of kinship. Without the blood relation there is no collateral inheritance. As Henry Lan-

ferman's natural children are not of kin to, not collateral to, his heirs by adoption, they cannot inherit from him. This supposed right of collateral inheritance was expressly denied by us in Merritt v. Morton, supra.

Lastly, we come to the case of Humphries v. Davis, 100 Ind., 274, cited to sustain the majority opinion. Some little history of that case and of the growing up of the Indiana doctrine is interesting. In Barnheizel v. Ferrell, 47 Ind., 335, it was held that on the death of the adopting parent the adopted child inherited from him; and that on the death of the child his natural parent would inherit such property to the exclusion of the children of the adopting parent—precisely the position of the appellee here. Later, there came on the case of Krug v. Davis, 87 Ind., 590. This litigation involved the same child that later came on in the Humphries v. Davies case. In the 87th Indiana case the doctrine of Barnhizel v. Ferrell was recognized and reaffirmed without argument. At once the Legislature of Indiana enacted an amendment to its statute (in the year 1883) in the following words:

"That should such adopted child die intestate, without leaving wife or husband, issue or their descendants, surviving him or her, seized of any real estate or owning any personal property which may have come to such child by gift, devise or descent from such adopting father or mother, such property so coming to such adopted child shall, on its death, descend to the heirs of said adopting father or mother the same as if such child had never been adopted."

This amendment was in force in the State of Indiana when the opinion in the Humphries v. Davis case was written. In other words, the Legislature of Indiana, before the case of Humphries v. Davis was decided, had adopted that precise statute, the spirit of which was caried out in that case. The Indiana case further endeavors to cast its determination upon an incorrect interpretation of the Roman law and somewhat upon the spirit of what it thinks ought to be the law. Chancellor Kent (Commentaries, 477) says: "It is probable that the errors of many of the courts in this country are replete with hasty and crude decisions; and such cases ought to be examined without fear, and revised without reluctance, rather than to have the character of our law impaired, and the beauty and harmony of the system destroyed by the perpetuity of error." Equally well it

may be said with entire respect to the great court of our sister State, that we should not adhere to its decisions when, in the light of reason and authority they appear to us to be unsound. As I have endeavored to make apparent, the case should not be accepted as authority upon the ascending or collateral rights of inheritance to or from an adopted child in Kentucky when we have no statute like that in force in Indiana when the Humphries case was written. That it does not properly interpret the Roman law, and that that law cannot add to or subtract from our statute, I have heretofore endeavored to show.

The natural equities of the matter may have some consideration. Albert's mother, the mother of his own blood, had foregone the happy joys and incidents of daily mutual association and companionship; she had given up the opportunity of watching her child's daily development and of shaping his course in life from his infancy up to his young manhood; she had not had his support nor aid. It is safe to assume that the boy, from his early youth, rendered to his adoptive father full value of the little estate which he derived from him. Upon the other hand, there is something in the position that the property accumulated by the adopting father should, upon the death of the adopted child, go back to the blood of the adopting father. If the latter equity be the stronger, it is not, in the face of the statute, strong enough to control. While equity has its proper place in the interpretation of statutes and may always, perhaps, be supposed to be the inciting motive in remedial legislation, its benign influence should not so far control the court as to induce it to make law. No sense of what we would do if the legislative opportunity were afforded to us to act should induce us to write into a statute an intent that it was never meant to have—nay, that could not have been in contemplation when the statute was enacted; for at that time there was no child adoption statute in Kentucky.

The majority opinion, predicating its argument throughout upon the right of the adopting father to take as a parent within section 1401, in concluding, departs from that position. It says that the question is not who is capable of inheriting from the adopted child but what estate the child takes from the adopting father; and then it determines the matter by saying, in substance, that Albert, the child, took by inheritance not an

unqualified estate in fee simple as the statutory heir of his adopting father, but a fee contingent or conditional upon his leaving issue or attaining the age of twenty-one. Is not the idea that a child, inheriting from his intestate parent, inherits a contingent or conditional estate, somewhat novel?

I have felt it my duty to dissent in this case, because I believe the majority opinion to be without precedent to support it and to be in direct conflict with Smith's Exor. v. Smith, supra, and the cases following it, which it neither attempts to consider, to harmonize, to differentiate, or to overrule.

Judges Settle and Lassing concur with me.